WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ  07095
732-636-8000
Attorneys for Plaintiffs



RECEIVED
NOV 18 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
:
:
AVIRAL RAI AND SANGEETA RAI,            :
            Plaintiffs,                 :                    **COMPLAINT**
                                        :
v.                                      :
                                        :
WB IMICO LEXINGTON FEE, LLC,            :
            Defendants.                 :
                                        :
------------------------------------------------------X

     Plaintiffs, Aviral Rai and Sangeeta Rai (jointly, "Plaintiffs" or "Purchasers"), by their attorneys, Wilentz, Goldman & Spitzer, P.A., for their Complaint against Defendants, WB Imico Lexington Fee, LLC ("Developer") and Gary Barnett, allege as follows:

### SUMMARY OF THE COMPLAINT

     1.    This is a civil action pursuant to the Interstate Land Sales Full Disclosure Act, as amended, 15 U.S.C. § 1701, et seq., ("ILSA" or "The Act"), including without limitation under the provisions of 15 U.S.C. §§ 1703, 1709 and 1719 of The Act and the regulations promulgated thereto, 24 C.F.R. 1710.1, et seq., (1991) ("Regulations"), to rescind an agreement to purchase a condominium unit at The Lucida, 151 East 85th Street, New York, New York 10028 (the "Condominium") and to recover the purchase deposit tendered to Developer and

other damages, as Developer never delivered a HUD Property Report to Purchasers before they signed the subject purchase agreement.

## SUBJECT MATTER JURISDICTION

2.      Plaintiffs' cause of action arises under federal law, specifically, the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701, et seq.  This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1719 to rescind a sale and purchase agreement for real property located within this district.

## PERSONAL JURISDICTION

3.      Personal jurisdiction over Defendants is proper under §§ 301 and 302 of the State of New York's Civil Practice Law & Rules, Rule 4 of the Federal Rules of Civil Procedure and under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.

## VENUE

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c), as, upon information and belief, (1) Defendants transact substantial and continuous business within this district; (2) Developer offered the contract at issue in this case within this district; (3) one or more of the parties executed the contract at issue in this case within this district; (4) the real property at issue in this case is located within this district and (5) the claims alleged in this complaint accrued within this district.

## PARTIES

5.      At all relevant times, plaintiffs resided at 62 West 62nd Street, New York, New York 10023.

#3230180 (153978.001)

6.      Upon information and belief, Developer is a Delaware limited liability company with its principal place of business located at c/o Extell Development Company, 805 Third Avenue, 7th Floor, New York, New York 10022.

7.      At all relevant times, Defendant Gary Barnett ("Barnett") was and still is a principal of Developer.

8.      Barnett executed a Certification of Sponsor and Sponsor's Principals in which he represented that he has primary responsibility for compliance with all laws and regulations as may be applicable as it relates to the offering for sale of units in the Condominium.

9.      Further, Barnett swore that the Offering Plan did not contain any fraud, deception, concealment, suppression or false pretense – notwithstanding that nowhere in the Offering Plan or the form of purchase agreement included in the Offering Plan and the Purchase Agreement with Plaintiffs was Plaintiffs' rights to revoke the Purchase Agreement disclosed, as required by ILSA.

10.     Barnett reviewed and approved the form of purchase agreement to use on behalf of purchasers at the Condominium, including the Purchase Agreement executed by Plaintiffs.

11.     Barnett participated in activities which directly or indirectly assisted in developing the Condominium.

12.     Barnett participated in activities which directly or indirectly assisted in the marketing of units for sale in the Condominium.

13.     Barnett participated in activities which directly or indirectly assisted in the offering of units for sale in the Condominium.

#3230180 (153978.001)

14.    Barnett directly or indirectly participated in the offering of units for sale in the Condominium.

15.    The Developer and Barnett, as Developer's principal, are each deemed a "developer" within the meaning of 15 U.S.C. § 1701(5), as they both, directly and/or indirectly, developed, marketed, offered for sale and/or participated in the offering for sale and/or contracted for sale of units at the Condominium.

## FACTUAL BACKGROUND

16.    Developer is the sponsor of the Condominium.

17.    Developer is authorized to sell units at the Condominium.

18.    The Condominium is comprised of more than 99 units offered for sale as part of a common promotional plan.

19.    The Defendants, in their campaign to sell the units in the Condominium, have employed several instrumentalities of interstate commerce, including the United States Postal Service and electronic means of data and voice communication, such as emails, cell phones and the Internet

20.    In its construction of the Condominium, the Developer has purchased goods and services which originated outside the State of New York and were transported to, and incorporated into, the Condominium, which is located in this district.

21.    On November 12, 2007, Plaintiffs and Developer signed a Purchase Agreement (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit A, the contents of which are incorporated by reference herein, to purchase Unit No. 8C at the Condominium (the "Unit") for $4,287,466.00.

-4-

22.     Pursuant to the Purchase Agreement, Plaintiffs paid the Developer a deposit of $643,119.90, which is fifteen (15%) percent of the purchase price of the Unit (the "Deposit").

23.     The sale of the unit at the Condominium to Plaintiffs is subject to the requirements of ILSA, including 15 U.S.C. §1703(a)(1)(B), which requires Developer to provide Purchasers with a certain "printed property report meeting the requirements of Section 1707" ("Property Report") in advance of the signing of any agreement to purchase.

24.     The Purchaser Agreement states in pertinent part:

**IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.**

25.     Developer did not provide Plaintiff with a Property Report in advance of the signing of the Purchaser Agreement.

26.     On or about November 10, 2009, Plaintiffs notified the Developer in writing that they elected to exercise their statutory right to rescind the Purchase Agreement and demanded the return of the Deposit.  A copy of the rescission demand letter is annexed hereto as Exhibit B.

27.     Plaintiffs' written notice to the Developer of their election and demand to rescind the Purchase Agreement was timely.

28.     To date, the Defendants have failed to acknowledge Plaintiffs' right to rescind the Purchase Agreement and return Plaintiffs' deposit monies, plus all accrued interest.

-5-

29.    Plaintiffs are entitled to, without limitation, revocation and rescission of the Purchase Agreement, and/or damages, including, but not limited to, return of all earnest monies, interest, attorney's fees and expenses for this action and cost incurred, and contribution from all who are liable in such manner and to such extent and to such further relief as provided under 15 U.S.C. § 1709.

## COUNT I

### (Violation of ILSA)

30.    Plaintiffs hereby reallege and reassert each allegation set forth above as if same were set forth at length herein.

31.    Pursuant to 15 U.S.C. §1703 (a)(1)(B), Developer was prohibited from selling the unit unless a printed Property Report meeting the requirements of 15 U.S.C. §1707 was furnished to Plaintiffs in advance of the signing of the Purchase Agreement.

32.    No Property Report was furnished to Plaintiffs in advance of the execution of the Purchase Agreement.

33.    Pursuant to 15 U.S.C. §1703(c), Developer's failure to provide the required Property Report grants Plaintiffs the right to rescind and revoke the Purchase Agreement at its option within two years from the date of execution of the Purchase Agreement.

34.    Based on the foregoing, Plaintiffs are entitled to rescission and revocation of the Purchase Agreement, return of the deposits pursuant to 15 U.S.C. §1703(e) and other damages pursuant to 15 U.S.C. §1709.

#3230180 (153978.001)

## PRAYER FOR RELIEF

35.     Plaintiffs pray for judgment and declarations against the Defendants as follows:

(1)     Rescission of the Purchase Agreement and return of their deposit monies of $643,119.90, plus accrued interest thereon;

(2)     that Plaintiffs be awarded their compensatory damages;

(3)     that Plaintiffs be awarded reasonable attorney's fees[1];

(4)     that Plaintiffs recover their costs of litigation;[2]

(5)     that Plaintiffs be awarded pre and post judgment interest,

(6)     that Plaintiffs be awarded any other damages allowable by any applicable statute; and

(7)     that Plaintiffs recover such other and further relief as the Court deems just and equitable.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiffs

By: _____
    LAWRENCE C. WEINER, ESQ.
    ALAN WASSERMAN, ESQ.

Dated:  November 18, 2009

---

[1] Plaintiffs are entitled to an award of reasonable attorneys fees and costs pursuant to U.S.C. §1709(c).

[2] Id.

-7-

#3230180 (153978.001)

Exhibit A

OPTION AGREEMENT

WB IMICO LEXINGTON FEE LLC

Sponsor-Seller

TO

Aviral Rai

and

Sangeeta Rai

Purchaser

UNIT NUMBER 8C

TOWER SECTION

OF

THE LUCIDA
151 EAST 85TH STREET
NEW YORK, NEW YORK 10028

TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | The Plan | 1 |
| 2. | Definitions | 1 |
| 3. | The Unit | 1 |
| 4. | Purchase Price | 1 |
| 5. | Closing of Title | 2 |
| 6. | Delivery of the Deed and Power of Attorney | 3 |
| 7. | Fee Title | 3 |
| 8. | Closing Adjustments and Real Estate Taxes | 4 |
| 9. | Mortgage Tax Credit | 4 |
| 10. | Closing Costs | 5 |
| 11. | Deposit | 5 |
| 12. | Binding Effect of Declaration, By-Laws and Rules and Regulations | 5 |
| 13. | Agreement Subject to Mortgage | 5 |
| 14. | Purchaser's Representations | 6 |
| 15. | Default by Purchaser | 6 |
| 16. | Closing Contingent Upon Plan Being Declared Effective | 7 |
| 17. | Sponsor's Inability to Convey the Unit | 8 |
| 18. | Fixtures, Appliances and Personal Property | 8 |
| 19. | Acceptance of Condition of Property | 8 |
| 20. | Damage to the Unit | 9 |
| 21. | No Representations | 10 |
| 22. | Prohibition Against Advertising and Selling | 10 |
| 23. | Broker | 11 |
| 24. | Agreement May Not Be Assigned | 11 |
| 25. | Binding Effect | 11 |
| 26. | Notices | 11 |
| 27. | Joint Purchasers | 12 |
| 28. | Performance by and Liability of Sponsor | 12 |
| 29. | Further Assurances | 12 |
| 30. | Option Agreement | 12 |
| 31. | Agreement Not Contingent Upon Financing | 12 |
| 32. | Costs of Enforcing and Defending Agreement | 12 |
| 33. | Severability | 13 |
| 34. | Strict Compliance | 13 |
| 35. | Governing Law | 13 |
| 36. | Waiver of Jury | 13 |
| 37. | Entire Agreement | 13 |
| 38. | Certain References | 13 |
| 39. | Captions | 13 |
| 40. | Rule of Construction | 13 |
| 41. | Successors and Assigns | 13 |
| 42. | No Oral Changes | 13 |
| 43. | Interstate Land Sales | 14 |

-i-

UNIT NUMBER(S) 8C

TOWER SECTION

OF

THE LUCIDA
151 EAST 85TH STREET
NEW YORK, NEW YORK 10028

(to be executed in quintuplicate)

This option agreement (the "Agreement"), made as of the date on the signature page of the Agreement, between WB IMICO Lexington Fee LLC, a Delaware limited liability company, having an office at c/o Extell Development Company, 805 Third Avenue, 7th Floor, New York, New York 10022 ("Sponsor"), and Aviral Rai and Sangeeta Rai, having an address at          , New York 10023 ("Purchaser").

W I T N E S S E T H:

1.    THE PLAN.  Purchaser acknowledges having received and read a copy of the Offering Plan for the Tower Section of The Lucida and all amendments thereto, if any, filed with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") at least three (3) days prior to Purchaser's signing this Agreement.  If Purchaser has not received and read the Plan and all amendments thereto at least three (3) full days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement within seven (7) days from the date of this Agreement. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding.

2.    DEFINITIONS.  Terms used herein which are also used in the Plan shall have the same meanings herein as therein unless the context otherwise requires.

3.    THE UNIT.  Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser agrees to purchase, the unit ("Unit") to be designated as Unit 8C in the Plan, together with the 0.5855 percentage undivided interest in the General Common Elements of the Condominium appurtenant thereto.

4.    PURCHASE PRICE.

4.1    The purchase price for the Unit ("Purchase Price") is $4,287,466.00.

The Purchase Price is payable as follows:

1

     (a)    $428,746.60 (the "First Deposit"), due upon Purchaser's signing and submitting this Agreement, by check (subject to collection), receipt of which is hereby acknowledged.

     (b)    $214,373.30 (the "Second Deposit"), by check payable no later than the earlier to occur of: (i) _____ which is six (6) months after the date of the Agreement or (ii) fifteen (15) days after Sponsor presents an amendment declaring the Plan effective, but in no event later than the Closing, subject to collection.

     (c)    $857,493.20 (the "Third Deposit"), by check, subject to collection, payable no later than the earlier to occur of: (i) the Closing or (ii) in the event Purchaser is in default under any of its obligations under this Agreement, the date Sponsor issues a notice of default hereunder. The First Deposit, Second Deposit and Third Deposit are hereinafter collectively referred to as the "Deposit."

     (d)    $2,786,852.90, constituting the balance of the Purchase Price, payable on the delivery of the deed as hereinafter provided.

     4.2    All checks shall represent United States currency and shall be drawn on or issued by a New York bank or trust company which is a member of The New York Clearing House Association, unless otherwise agreed to by Sponsor. Checks for the Deposit (other than any portion of the Deposit paid at the Closing pursuant to the provisions of this Agreement) shall be made payable to "Polsinelli Shalton Flanigan Suelthaus PC, Escrow Agent." Checks for the balance of the Purchase Price (including any portion of the Deposit paid at the Closing pursuant to the provisions of this Agreement) shall be made payable by good certified check of Purchaser or official bank check to the direct order of "WB IMICO Lexington Fee LLC" or such other party as Sponsor may designate upon not less than two (2) days prior notice. If any check is returned for insufficient funds or any other reason, Sponsor at its option, may declare this Agreement void ab initio and of no further force and effect and may institute an action against Purchaser for the collection of the Deposit as liquidated damages or may declare a default by Purchaser under this Agreement which shall entitle Sponsor to exercise any of the remedies set forth in Article 15 hereof.

5.    <u>CLOSING OF TITLE</u>.

     5.1    The closing of title shall be held at such place in the City and State of New York and on such date and hour as Sponsor may designate to Purchaser on notice served not less than thirty (30) days' prior to the scheduled date for closing. If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Sponsor's attorneys at closing an extra fee as set forth in the Plan. Sponsor, from time to time, may adjourn the date and hour for closing on written notice to Purchaser. In the event of such adjournment, a closing may be rescheduled by Sponsor upon written notice to Purchaser, which notice shall fix a new date, hour and place for the closing of title and will be given not less than two (2) business days prior to the new scheduled date and time for closing. In the event this Agreement is executed after the First Closing, the closing of title shall occur thirty (30) days after the date of this Agreement.

5.2     The closing of title shall occur only after or concurrently with the compliance with the prerequisites as set forth under "Terms of Sale" in Part I of the Plan.

5.3     The term "Closing Date" or "closing of title" or words of similar import, whenever used herein, shall mean the date designated by Sponsor on which the deed to the Unit is delivered to Purchaser, or any adjourned date fixed by Sponsor pursuant to subsection 5.1 hereof.

6.     DELIVERY OF THE DEED AND POWER OF ATTORNEY.

6.1     At the closing of title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying title to the Unit to Purchaser. The deed shall be prepared by Sponsor in substantially the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly execute a New York City Real Property Transfer Tax return and any other forms then required by Law, all of which shall be prepared by Sponsor.

6.2     At the closing of title and simultaneously with the delivery of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board, the Residential Board and Declarant (as defined in the Declaration) substantially in the form set forth in Part II of the Plan.

6.3     The deed and power of attorney to the Condominium Board, Residential Board and Declarant (as defined in the Declaration) shall be delivered to the representative of the title company insuring Purchaser's title (or, if no such representative is present, then to Sponsor's attorney) for recording in the City Register's Office, which recording shall be at Purchaser's expense. After being recorded, the deed shall be returned to Purchaser and the power of attorney shall be sent to the Managing Agent.

6.4     Sponsor shall deliver to Purchaser a certification stating that Sponsor is not a foreign person in the form then required by the Code Withholding Section and (ii) each party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, as such other party may reasonably request in order to comply with IRS §6045(e), as amended, or any successor provision or any regulations promulgated pursuant thereto, insofar as the same requires reporting of information in respect of real estate transactions.

7.     FEE TITLE. At the closing of title, Sponsor shall convey to Purchaser fee simple title to the Unit, free and clear of all encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof. Any encumbrance to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the closing of title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Commonwealth Land Title Insurance Company, having an address at Two Grand Central Tower, 140 East 45th Street, 22nd Floor, New York, NY 10017 (Tel: (212) 949-0100, Fax: (212) 983-8430) (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to the Purchaser, to insure Purchaser that it will not be

3

collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien.

8.    CLOSING ADJUSTMENTS AND REAL ESTATE TAXES.

8.1    Subject to Paragraph 15 hereof, the following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)    real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)    Tower Common Charges for the month in which title closes; and

(c)    accrued rent and any other charges pursuant to an interim lease or use and occupancy agreement, if any, covering the Unit.

8.2    If closing of title occurs before the tax rate is fixed, adjustment of taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title. If a Unit has not been separately assessed as of the Closing Date, the adjustments and collection of taxes under subsection 8.1(a) hereof and future tax payments shall be as described in the Section of the Plan entitled "Closing Costs and Adjustments."

8.3    If Sponsor obtains a refund for real estate taxes paid (or a credit for such taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the closing of title.

8.4    The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein.

8.5    Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. The provisions of this subsection shall survive the closing.

9.    MORTGAGE TAX CREDIT.    In the event a mortgage recording tax credit becomes available pursuant to Section 339-ee(2) of the Condominium Act, it is specifically understood that such credit shall inure to the benefit of Sponsor. Accordingly, at closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. Sponsor at closing will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed. Alternatively, Sponsor may require, in its sole discretion, that a Purchaser, who is financing the purchase of said Tower Unit with a purchase money loan secured by a mortgage (the "Purchase Money Mortgage"), must cause the lender making such loan to accept from the Sponsor an assignment of a portion of any mortgage securing the Property in an amount up to the

4

Purchase Money Mortgage as determined by Sponsor. Upon such assignment, the Purchase Money Mortgage will be exempt from mortgage recording tax under Section 255 of the Real Property Tax Law. Sponsor will be solely entitled to the benefits of any mortgage tax credit which Purchaser receives as a result of such assignment. Accordingly, at the Closing, Purchaser will pay to Sponsor an amount equal to the mortgage recording tax which would have otherwise been due in connection with the recording of the Purchase Money Mortgage.

10.    CLOSING COSTS.  In addition to those costs and adjustments described in Articles 8 and 9 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in Part I of the Plan entitled "Closing Costs and Adjustments."

11.    DEPOSIT.  The Deposit made pursuant to this Agreement is subject to the requirements of Section 71-a(3) of the State of New York Lien Law (the provisions of which are set forth in Part II of the Plan and deemed incorporated herein by reference) and Sections 352-e(2-b) and 352-h of the General Business Law of the State of New York.  Any Deposit received from Purchaser will be held in accordance with the provisions of the Subsection entitled "Escrow and Trust Fund Requirements" under the Section entitled "Procedure to Purchase" set forth in Part I of the Plan.  By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under this Agreement.  Sponsor is required by Law to submit a Form 1099 to the Internal Revenue Service reporting interest earned on Purchaser's Deposit, if any.  Purchaser will be taxed accordingly on such interest.

12.    BINDING EFFECT OF DECLARATION, BY-LAWS AND RULES AND REGULATIONS.  Purchaser hereby accepts and approves the Plan (including the Declaration, By-Laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof.

13.    AGREEMENT SUBJECT TO MORTGAGE.  No encumbrance shall arise against the Property as a result of this Agreement or any monies deposited hereunder.  In furtherance and not in limitation of the provisions of the preceding sentence, the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage, including, but not limited to, any construction or building loan mortgage, heretofore or hereafter made any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser.  This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses.  Sponsor shall, at its option, either satisfy such mortgages or obtain a release of each Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date, unless Purchaser voluntarily assumes such mortgage or consents to the continuation of the lien thereof.  The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its (their) undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of its other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the

5

15.2    TIME IS OF THE ESSENCE with regard to Purchaser's obligations to pay the balance of the Purchase Price and to perform Purchaser's other obligations under this Agreement. If Purchaser fails to make such payment when required as herein provided or fails to perform any of Purchaser's other obligations hereunder, Sponsor shall give notice to Purchaser of such default. If such default shall not be cured within thirty (30) days thereafter, Sponsor may, at its option, cancel this Agreement by notice of cancellation to Purchaser. If Sponsor elects to cancel this Agreement Sponsor (a) may retain all sums deposited by Purchaser hereunder (including any amounts paid by Purchaser for additional work in the Tower Unit), together with interest earned thereon, and (b) shall have the right to receive all or any portion of the Deposit (if same has not previously been paid) together with such additional sums as may aggregate the amount of damages incurred by Sponsor. Upon cancellation of this Agreement as aforesaid, Sponsor may sell the Unit to any third party as though this Agreement had never been made (without any obligation to account to Purchaser for any part of the proceeds of such sale). Notwithstanding the foregoing, if and only to the extent that the sale of the Unit is not exempt from the provisions of the Interstate Land Sales Full Disclosure Act, the amount of the Deposit to be retained by Sponsor upon Purchaser's failure to cure a default after the expiration of the thirty (30) day notice and opportunity to cure period will be the greater of (i) fifteen percent (15%) of the Purchase Price (excluding any interest owed) or (ii) the amount of damages incurred by Sponsor due to the default.

15.3    If Purchaser fails for any reason to close title to the Unit on the originally scheduled Closing Date  (a) the closing apportionments described in Section 8.1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual closing of title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

16.    CLOSING CONTINGENT UPON PLAN BEING DECLARED EFFECTIVE.

16.1    The respective obligations of Purchaser and Sponsor hereunder are contingent upon the Plan being declared effective. The Plan shall not be declared effective except in accordance with the prerequisites set forth in the Plan, as same may be amended from time to time. Purchaser understands and agrees that Sponsor shall have the right to abandon the Plan at any time prior to its being declared effective or thereafter in certain limited cases set forth in the Plan (see the Section in the Plan entitled "Effective Date" for full details). Sponsor shall notify Purchaser, in writing or by a duly filed amendment to the Plan, when the Plan becomes effective or is abandoned.

16.2    If the Plan is abandoned or if after being declared effective the Plan will not be consummated for any reason, this Agreement will be deemed canceled and the Deposit paid by Purchaser hereunder, together with interest earned thereon, if any, will be disbursed to Purchaser, subject to Sponsor's rights to retain certain funds deposited by Purchaser for special

7

work in the Unit, as more particularly described in the Section of the Plan, entitled "Effective Date." After the monies are so disbursed, Purchaser and Sponsor will have no claim against each other or the Selling Agent in connection with this Agreement or the Plan, and all of same will be released and discharged from all liabilities and obligations hereunder and under the Plan.

17.    SPONSOR'S INABILITY TO CONVEY THE UNIT.    If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan, Sponsor will not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability, and, in such case, if Sponsor notifies Purchaser of its refusal to cure such inability and if Purchaser is not in default hereunder, Purchaser's sole remedy will be to either (a) take title to the Unit subject to such inability (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement.    If Purchaser so elects to terminate this Agreement, Sponsor will, within thirty (30) days after receipt of notice of termination from Purchaser, return to Purchaser the Deposit paid by Purchaser hereunder, together with interest earned thereon, if any, subject to Sponsor's rights to retain certain funds deposited by Purchaser for special work in the Unit, as more particularly described in the Section of the Plan, entitled "Terms of Sale," and, upon making such payment, this Agreement will be terminated and neither party hereto will have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice of Purchaser in writing to Sponsor within fifteen (15) days after the giving of Sponsor's notice of refusal to cure such inability, failing which it will be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to acquire title subject to such inability).

18.    FIXTURES, APPLIANCES AND PERSONAL PROPERTY.    Only those fixtures, appliances and items of personal property which are described in the Description of the Property in Part II of the Plan as being part of the Unit are included in the sale of the Unit pursuant to the provisions of this Agreement. At the Closing, Sponsor shall transfer to Purchaser any assignable warranties and undertakings received by Sponsor which relate to appliances, equipment or fixtures located in the Unit.

19.    ACCEPTANCE OF CONDITION OF PROPERTY.    Purchaser shall accept title (without abatement in, or credit against, the Purchase Price or any provision for escrow deposits at the closing of title) notwithstanding the failure to complete construction of (a) the "punch list" items in the Unit (b) other Units or (c) the Common Elements of the Property which do not prevent Purchaser's use of the Unit provided that Sponsor delivers a temporary certificate of occupancy for the Unit. The Unit and the fixtures and personal property contained therein, are being sold and delivered as described in the Plan, at the time of transfer of title to such Unit, unless Sponsor and Purchaser otherwise agree. Sponsor will maintain each Unit, and the fixtures and personality contained therein, up to the time of the transfer of title to the Unit in question. The Purchaser of a Tower Unit shall have the right to inspect such Unit prior to the Closing Date. However, the failure of Sponsor to complete "punch list" type work shall not be a ground for Purchaser delaying the Closing provided that Sponsor agrees to complete such work promptly after closing. Purchaser will receive at least five (5) business days notice that the Unit is available for inspection and Sponsor reserves the right to postpone and/or reschedule any scheduled inspections of the Unit upon one (1) business day's notice and Sponsor reserves the

8

right to schedule additional inspections as Sponsor deems necessary or appropriate. If Purchaser fails to inspect the Unit within said period(s), Purchaser shall be deemed to have accepted the Unit in good condition and in accordance with the terms of the Plan. Except as expressly provided in this Agreement or the Plan, including but not limited to subparagraph (f) of the subsection entitled "Sponsor's Obligations with Respect to the Building" of the Section entitled "Rights and Obligations of Sponsor," Sponsor shall have no obligation to repair or improve the Unit, any portion of the Property, the appliances, equipment or fixtures attached to or used in connection with the Unit or the Property. Sponsor is obligated to construct the Building in accordance with all applicable codes and filed building plans and specifications as well as the provisions of the Plan. The Housing Merchant Implied Warranty Law (General Business Law Article 36-B) is not applicable to this offering. Sponsor is not making any express or implied warranties of fitness for a particular purpose, merchantability or habitability. Unless caused by a violation of the Sound Transmission Code or other applicable code, there is no warranty as to sound transmission. Unless caused by a violation of an applicable code with regard to the ventilation system or other applicable code, there is no warranty as to odors. Unless caused by a code violation, there is no warranty with respect to mold, mildew, spores, fungi or other toxins. There is no warranty as to view or light quality. The sponsor's obligation, regardless of any limitations in the warranty, is to construct the premises in accordance with all applicable codes and filed plans and specifications, and any conflict between the disclaimers and the Sponsor's obligation to construct the premises in accordance with all applicable codes and filed plans and specifications shall be resolved in favor of the latter. In the event of any conflict between the foregoing disclaimers and Sponsor's obligations to construct the Building in accordance with all applicable codes and filed building plans and specifications as well as the provisions of the Plan, Sponsor's obligations to construct the Building in accordance with all applicable codes and filed building plans and specifications as well as the provisions of the Plan will control. In no event will Sponsor be liable for incidental or consequential damages (whether based on negligence, breach of contract, warranty, or otherwise). See the Section entitled "Rights and Obligations of Sponsor" in Part I of the Plan for further discussion.

Sponsor will not be obligated to correct, and will not be liable to any Board or Unit Owner as a result of any defects in construction, or in the installation or operation of any mechanical equipment, appliances, other equipment, finishes, materials or fixtures (including kitchen appliances and bathroom fixtures), except as more as specifically set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

Notwithstanding the foregoing, Sponsor will be obligated to repair abnormal scratches in plastic laminate, vitreous china, natural stone, wood, porcelain and metallic surfaces by filling or refinishing the same, but Sponsor will not be obligated to replace any such surfaces. The provisions of this Article shall survive the closing of title.

20.    DAMAGE TO THE UNIT. If between the date of this Agreement and the closing of title the Unit is damaged by fire or other casualty, the following shall apply:

20.1    The risk of loss to the Unit by fire or other casualty is assumed by Sponsor until the earlier of closing of title or possession of the Unit by Purchaser, but without any obligation or liability by Sponsor to repair or restore the Unit. If Sponsor elects to repair or restore the Unit, this Agreement shall continue in full force and effect, Purchaser shall not have

9

the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the respective Boards and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the closing of title.

20.2    In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit, or, if the Declaration has been recorded prior thereto and the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-Laws, this Agreement will be deemed canceled and of no further force and effect and Sponsor will return to Purchaser the Deposit paid by Purchaser hereunder, together with interest earned thereon, if any, subject to Sponsor's rights to retain certain funds deposited by Purchaser for special work in the Unit, as more particularly described in the Section of the Plan, entitled "Terms of Sale," and neither party hereto will have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor will retain all such sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

21.    <u>NO REPRESENTATIONS</u>.  Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Tower Common Charges allocable to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit, or any other data, except as herein or in the Plan specifically represented, Purchaser having relied solely on such Purchaser's own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Sponsor makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Unit, the Common Elements or any other part of the Property other than as set forth herein or in the Plan. The provisions of this Article shall survive the closing of title.

22.    <u>PROHIBITION AGAINST ADVERTISING AND SELLING</u>.  Prior to the closing of title to a Tower Unit, the Agreement prohibits Purchaser from listing the Tower Unit for resale or rental with any broker or from advertising or otherwise offering, promoting or publicizing the availability of the Tower Unit for sale or lease, without Sponsor's prior written consent. In addition, a Purchaser (other than a Purchaser purchasing for such Purchaser's own occupancy) may not advertise, list or sell a Tower Unit acquired from Sponsor for twelve (12) months after acquisition of such Tower Unit (provided however, such limitation shall not apply from and after the date that the Sponsor conveys title to all of the Tower Units). Any such conveyances in violation of the foregoing will be voidable by Sponsor. The provisions of this

10

Article 22 shall survive the closing of title.

23.    BROKER.    Purchaser represents to Sponsor that Selling Agent and Douglas Elliman (collectively the "Broker") is [are] the only broker(s) or sales agent(s) with whom Purchaser has dealt in connection with this transaction, and Sponsor agrees to pay the commission earned by the Broker pursuant to a separate agreement.    Purchaser agrees that should any claim be made against Sponsor for commissions by any broker, other than the Broker, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees.    The provisions of this Article 23 shall survive the closing of title.

24.    AGREEMENT MAY NOT BE ASSIGNED.    Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor.    If Purchaser is a corporation, partnership, limited liability company, trust or other legal entity, any sale, assignment, transfer, pledge, encumbrance or other disposition of any of the ownership interest of Purchaser (including without limitation, the stock, membership or beneficial interests of the stockholders, partners, members or beneficiaries of Purchaser or its stockholders, partners, members or beneficiaries) shall be considered an assignment of this Agreement and shall be subject to the provisions, prohibitions and terms of this Article concerning assignment of this Agreement.    For purposes of this Agreement, it is the intent of the part(ies) that the individuals controlling Purchaser shall be deemed to be N/A.    Any purported assignment by Purchaser in violation of this Agreement will constitute a default hereunder and will be voidable by Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor.    If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement, then Purchaser will be required to pay Sponsor's attorneys a fee of $1,500, in advance, for preparation of an assignment agreement.

25.    BINDING EFFECT.    This Agreement shall not be binding on Purchaser or Sponsor until a fully executed counterpart hereof has been delivered to Purchaser.    If this Agreement is not accepted within thirty (30) days after delivery by Purchaser of an executed Agreement by the delivery to Purchaser of a fully executed counterpart, this Agreement shall be deemed to have been rejected and canceled and the deposit paid on the execution hereof shall be promptly returned to Purchaser.

26.    NOTICES.    Any notice, request, letter, consent or other communication hereunder or under the Plan (other than amendments to the Plan which shall be served in accordance with the Plan or documents for which the method of notice and or delivery is otherwise set forth in the Plan) shall be in writing and delivered by regular mail as well as hand delivered or sent, postage prepaid, by registered or certified mail, by facsimile or by Federal Express or other reputable overnight courier, to Purchaser at the address given at the beginning of this Agreement, and to Sponsor at the address given at the beginning of this Agreement, with a copy to Extell Development Company, 805 Third Avenue, 7th Floor, New York, New York 10022, Attn.: Ahuva Genack, Esq. in the same manner as notice is given to Sponsor, or to such other address as either party may hereafter designate to the other in writing.    Except as otherwise expressly provided herein, the date of hand delivery or mailing shall be deemed to be the date of the giving

11

of notice, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address. Any notice either of the parties hereto receives from the other party's attorneys shall be deemed to be notice from such party itself (including, without limitation, any notices of closing or default which Sponsor's counsel is hereby expressly designated and empowered to issue). A failure by Purchaser to acknowledge receipt of any notice, request, letter, consent or other communication hereunder shall not in anyway invalidate such communication. Notwithstanding anything to the contrary, notices regarding closing costs or ministerial matters, the rescheduling of Closing Dates or the scheduling or rescheduling of inspections may be made by facsimile or by electronic mail to each party's attorneys.

27.    JOINT PURCHASERS.  The term "Purchaser" shall be read as "Purchasers" if more than one person are purchasers, in which case their obligations shall be joint and several.

28.    PERFORMANCE BY AND LIABILITY OF SPONSOR.  Purchaser's acceptance of the deed for the Unit shall be deemed to be a full performance and discharge of each and every agreement and obligation on the part of Sponsor to be performed pursuant to the provisions of this Agreement, the Plan, 13 NYCRR, Part 20 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Plan) and General Business Law §352-e, except those (if any) herein or therein expressly stated to survive delivery of such deed.

29.    FURTHER ASSURANCES.  Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction. The provisions of this Article shall survive the closing of title.

30.    OPTION AGREEMENT.  The parties acknowledge that, for federal income tax purposes only, this Agreement shall be deemed an option.

31.    AGREEMENT NOT CONTINGENT UPON FINANCING.  The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof) stated in Section 4 of this Agreement, and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance Purchaser's purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement.

32.    COSTS OF ENFORCING AND DEFENDING AGREEMENT.  Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

33.   SEVERABILITY.  If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by Law.

34.   STRICT COMPLIANCE.   Any failure by Sponsor to insist upon the strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and Sponsor, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

35.   GOVERNING LAW.  The provisions of this Agreement shall be governed by and construed in accordance with the Laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of Law.

36.   WAIVER OF JURY.  EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, OR CONNECTED WITH, OR RELATING TO, THE PLAN THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY. THE PROVISIONS OF THIS ARTICLE SHALL SURVIVE THE CLOSING OF TITLE.

37.   ENTIRE AGREEMENT.  This Agreement together with the Plan constitutes the entire agreement between the parties and supersedes any and all understandings and agreements between the parties with respect to the subject matter hereof.

38.   CERTAIN REFERENCES.  A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.  The terms "herein," "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires.  Unless otherwise stated, all references herein to Articles, Sections, subsections or other provisions are references to Articles, Sections, subsections or other provisions of this Agreement.

39.   CAPTIONS.  The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

40.   RULE OF CONSTRUCTION.   There shall be no presumption against the draftsman of this Agreement or the Plan.

41.   SUCCESSORS AND ASSIGNS.  The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

42.   NO ORAL CHANGES.  This Agreement cannot be changed or terminated and no

13

provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES HERETO OR BY AN AMENDMENT TO THE PLAN.

43.    <u>INTERSTATE LAND SALES</u>.    THE FOLLOWING PROVISION IS DEEMED INCORPORATED ONLY SO LONG AS THE PROPERTY IS NOT EXEMPT FROM THE PROVISIONS OF THE INTERSTATE LAND SALES FULL DISCLOSURE ACT 15 USC §§ 1701 ET SEQ.

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SPONSOR UNTIL MIDNIGHT OF THE SEVENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGULATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date below.

Date: _November 12, 2007_____
(To be inserted after execution by Sponsor)

SPONSOR:

WB IMICO LEXINGTON FEE LLC

By: _____
    Name: Raizy Haas
    Title:  Authorized Signatory

PURCHASER:

_____
Aviral Rai

(Social Security or Federal
I.D. Number): _____
Telephone No.: ___

_____
Sangeeta Rai

(Social Security or Federal
I.D. Number): _____
Telephone No.: _____

15

SCHEDULE A
PERMITTED ENCUMBRANCES

1.    Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.    Any state of facts which an accurate survey of the Property would show, provided such state of facts would not make title to the Unit uninsurable, except as otherwise permitted herein.

3.    The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Declaration, the By-Laws and the Rules and Regulations, the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans; as all of the same may be amended from time to time.

4.    Consents by the Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.    Any easement or right of use in favor of any utility company for construction, use, Maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6.    Revocability of licenses for vault space, if any, under the sidewalks and streets.

7.    Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations between record lines of the Property and retaining walls and the like, if any.

8.    Leases and service, Maintenance, employment, concessionaire and license agreements, if any, of other Units or portions of the Common Elements.

9.    The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the closing of title.

10.    The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that the Sponsor shall pay all such assessments due prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

11.    Any declaration or other instrument affecting the Property which the Sponsor deems necessary or appropriate to comply with any Law or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

16

12.    Any encumbrance as to which Commonwealth Land Title Insurance Company (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (1) will not be collected out of the Unit if it is a lien or (2) will not be enforced against the Unit if it is not a lien.

13.    Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Tower Unit for residential purposes.

14.    Any lease covering the Unit made from the Sponsor to the Purchaser.

15.    The Retail Leases (as such term is defined in the Plan).

16.    Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, Residential Board, or another Unit Owner to correct.

17.    Terms, Covenants, Conditions, Provisions and Agreements of Subway Easement Agreement between New York City Transit Authority and [_____] dated as of _____ ____, 2____, recorded _____ ___, 2____ in CRFN _____.

18.    Terms, covenants, conditions, provisions and agreements in the Lower Parcel Lease.

19.    Declaration of Zoning Lot Restrictions dated as of March 9, 2007 recorded March 15, 2007 as CRFN 2007000138234 and Zoning Lot Description and Ownership Statement dated March 8, 2007 recorded March 15, 2007 as CRFN 2007000138235.

20.    Any title exceptions noted in the Specimen Title Policy set forth in Part II of the Plan.

## RIDER TO AGREEMENT

Re:    Unit No. 8C ("Unit")
       Purchaser(s): Aviral Rai and Sangeeta Rai ("Purchaser")
       The Lucida
       151 East 85th Street
       New York, New York 10028

This Rider (the "Rider") amends and modifies that certain Agreement (the "Agreement") by and between WB/IMICO Lexington Fee LLC ("Sponsor") and Purchaser with respect to the above referenced Unit in the condominium known as The Lucida located at 151 East 85th Street, New York, New York 10028. In case of any inconsistencies between any of the terms and conditions of the Agreement, including any handwritten modifications thereto, and the terms and conditions of this Rider, the terms and conditions of this Rider shall prevail. All of the paragraphs and provisions contained in this Rider are incorporated into the Agreement and made a part thereof with the same force and effect as if therein originally contained.

A. THE PLAN.  A new last sentence is added to Paragraph 1 of the Agreement as follows:

Notwithstanding anything to the contrary contained herein, in the event of any inconsistency between the provisions of the Agreement and this Rider and the Plan which arise from changes to the Agreement negotiated between Sponsor and Purchaser, the provisions of the Agreement and this Rider shall govern and be binding.

B. PURCHASE PRICE.  Paragraph 4.1 of the Agreement is deleted entirely and the following language is substituted in its place:

4.1 PURCHASE PRICE.
The purchase price for the Unit ("Purchase Price") is $4,287,466.00.

The Purchase Price is payable as follows:

(a) $428,746.60 (the "First Deposit"), due upon Purchaser's signing and submitting this Agreement, by check (subject to collection), receipt of which is hereby acknowledged.

(b) $214,373.30 (the "Second Deposit"), by check payable no later than the earlier to occur of: (i) *May 12, 2007* which is six (6) months after the date of the Agreement, or (ii) fifteen days (15) days after Sponsor presents an amendment declaring the Plan effective, but in no event later than the Closing, subject to collection.

(c) $0.00 (the "Third Deposit"), by check payable no later than the earlier to occur of: (i) the Closing or (ii) in the event Purchaser is in default under any of its obligations under this Agreement, the date Sponsor issues a notice of default hereunder. The First Deposit,

1

Second Deposit and Third Deposit are hereinafter collectively referred to as the "Deposit."

(d) $3,644,346.10, constituting the balance of the Purchase Price, payable on the delivery of the deed as hereinafter provided.

C.  PURCHASE PRICE. Notwithstanding the provisions of Section 8 of the Agreement, and other applicable provisions of the Agreement and Plan, Sponsor shall be responsible for the payment at Closing of one hundred percent (100%) of the New York State Additional Tax, commonly referred to as the "Mansion Tax"

D.  CLOSING OF TITLE. Paragraph 5.1 is amended by the addition of the following language at the end of the last sentence:

Notwithstanding the foregoing, Purchaser will be entitled to one (1) adjournment of the closing for a period not to exceed fifteen (15) calendar days, without incurring penalties as provided for in Paragraph 15.3 of the Agreement, provided that Sponsor is notified of such adjournment within five (5) calendar days of the date of which Purchaser's attorney receives the closing notice by facsimile copy thereof.

E.  DEFAULT BY PURCHASER. Provided that Purchaser has the right to adjourn the Closing Date in accordance with Paragraph D of this Rider, Paragraph 15.3 of the Agreement is deleted in its entirety and replaced with the following:

If Purchaser fails for any reason to close title to the Unit on or before the date which is fifteen (15) calendar days from the originally scheduled Closing Date designated by Sponsor (such Closing Date hereinafter referred to as the "Adjustment Date") (a) the closing apportionments described in Section 8.1 of this Agreement will be made as of midnight of the day preceding the Adjustment Date, regardless of when the actual closing of title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the Adjustment Date to (and including) the day before the date the actual closing of title occurs. If, through no fault of Purchaser, Sponsor postpones the closing until a date which is after the Adjustment Date, these provisions will apply to such rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

F.  CREDIT FOR CLOSING COSTS. In the event that Douglas Elliman is entitled to a brokerage commission on Unit 8C pursuant to its agreement with Sponsor ("Douglas Elliman Agreement"), Douglas Elliman agrees, as set forth in the attached letter which is **Exhibit A** to this Agreement, to accept as full compensation $42,874.66 less than the amount it would otherwise have received pursuant to the Douglas Elliman Agreement. At closing, Sponsor will issue a credit to Purchaser in the full amount foregone by Douglas Elliman which in no event will be greater than $42,874.66.

2

G. CONFIDENTIALITY. Each party recognizes the desirability of maintaining the confidentiality of the terms provided for in this Agreement. Accordingly, the parties shall keep confidential the existence and terms of the transaction provided for in this Agreement and any and all information, if any, that (i) is or becomes generally available to the public in a manner other than as a result of a disclosure by the party receiving the information; (ii) was available to the receiving party on a nonconfidential basis prior to its disclosure to receiving party by the party providing the information; or (iii) is required by law or a court of competent jurisdiction.

The captions in this Rider and the Agreement are for the convenience of reference only and in no way define, limit or describe the scope of this Rider or the Agreement or the intent of any provision hereof.

IN WITNESS WHEREOF, the parties have executed this Rider as of the date written hereinbelow.

DATE: _November 12, 2007_
(To be inserted by Sponsor after countersignature by Sponsor)


SPONSOR:
WB/IMICO Lexington Fee LLC

By: _____
Name: Raizy Haas
Title: Authorized Signatory



PURCHASER:

_____
Aviral Rai

_____
Sangeeta Rai

3

EXHIBIT A

## STORAGE BIN LICENSE RIDER TO AGREEMENT

Re:    Unit No. 8C

       Aviral Rai and Sangeeta Rai ("Purchaser")
       Storage Bin No. <u>TBD</u>
       The Lucida
       151 East 85th Street
       <u>New York, New York 10028</u>

THIS RIDER TO AGREEMENT made as of the _12_ day of _November_ 2007 by and between WB IMICO Lexington Lessee LLC, a Delaware limited liability company, having an office at c/o Extell Development Company, 805 Third Avenue, 7th Floor, New York, New York 10022 ("Developer") and Aviral Rai and Sangeeta Rai, having an address at ......... , New York 10023 ("Purchaser").

### W I T N E S S E T H:

1.    This Rider (the "Rider") amends and modifies that certain Agreement (the "Agreement") by and between WB IMICO Lexington Fee LLC ("Sponsor") and Purchaser with respect to the above referenced Unit in the condominium known as The Lucida located at 151 East 85th Street, New York, New York. In case of any inconsistencies between any of the terms and conditions of the Agreement, including any handwritten modifications thereto, and the terms and conditions of this Rider, the terms and conditions of this Rider shall prevail. All of the paragraphs and provisions contained in this Rider are incorporated into the Agreement and made a part thereof with the same force and effect as if therein originally contained.

2.    (a)    Upon and subject to the terms and conditions set forth in this Rider, Developer agrees to sell and grant for a term of years which shall expire when the Lower Parcel Lease expires on the Retail Unit and Rental Unit and Purchaser agrees to purchase a license to use a storage bin designated as Storage Bin <u>TBD</u> (the "Storage Bin") simultaneously with the closing of title to the Unit. The license to use the Storage Bin (the "Storage Bin License") shall be substantially in the form set forth in Part II of the Condominium Offering Plan. The Purchase Price for the Storage Bin License is $<u>0.00</u> ("Storage Bin Price") which is separate from and in addition to the Purchase Price for the Unit. The Storage Bin Price shall be paid at the closing of title to the Unit by Purchaser delivering a good certified check of Purchaser or official bank check payable to Developer or such other party as Developer may designate upon not less than two (2) days notice. Purchaser shall be responsible for the payment of transfer and other taxes, if any, that are associated with the Storage Bin License.

(b)    A default by Purchaser under this Rider shall constitute a default under the Agreement for the Unit and that any other default by Purchaser under the Agreement for the Unit shall constitute a default under this Rider entitling Sponsor to those remedies as more fully described in the Agreement and the Plan.

(c)    Purchaser acknowledges and agrees that the Storage Bin may not be ready

(c)     Purchaser acknowledges and agrees that the Wine Storage Bin may not be ready for use and/or occupancy at the time of the closing of title to the Unit and that notwithstanding such event, Purchaser shall remain obligated to close title to the Unit and purchase the Wine Storage Bin License.  In such event the Wine Storage Bin Price shall be paid to Escrow Agent and Wine Storage Bin License shall be executed at Closing and the Wine Storage Bin Price and Wine Storage Bin License shall be held in escrow by the Escrow Agent. Upon notification from Developer that the Wine Storage Bin is available for use, Escrow Agent shall release the Wine Storage Bin Price to Developer with interest earned thereon, if any, and shall deliver Wine Storage Bin License to Purchaser.

3.     The captions in this Rider and the Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Rider or the Agreement or the intent of any provision hereof.

IN WITNESS WHEREOF, the parties have executed this Rider as of the date written hereinbelow.

DATE: *November 12, 2007*
(To be inserted by Developer after
countersignature by Developer)

DEVELOPER:
WB IMICO LEXINGTON LESSEE LLC

By: _____
    Name: Raizy Haas
    Title:  Authorized Signatory

PURCHASER:

_____
Aviral Rai

_____
Sangeeta Rai

Consented to by Sponsor:
WB IMICO LEXINGTON FEE LLC

By: _____
    Name: Raizy Haas
    Title:  Authorized Signatory

## WINE STORAGE BIN LICENSE RIDER TO AGREEMENT

Re:    Unit No. 8C

      Aviral Rai and Sangeeta Rai ("Purchaser")
      Wine Storage Bin No. <u>TBD</u>
      The Lucida
      151 East 85th Street
      <u>New York, New York 10028</u>

      THIS RIDER TO AGREEMENT made as of the _12_ day of _November_ 2007 by and between WB IMICO Lexington Lessee LLC, a Delaware limited liability company, having an office at c/o Extell Development Company, 805 Third Avenue, 7th Floor, New York, New York 10022 ("Developer") and Aviral Rai and Sangeeta Rai, having an address at _____ , New York 10023 ("Purchaser").

## W I T N E S S E T H:

      1.    This Rider (the "Rider") amends and modifies that certain Agreement (the "Agreement") by and between WB IMICO Lexington Fee LLC ("Sponsor") and Purchaser with respect to the above referenced Unit in the condominium known as The Lucida located at 151 East 85th Street, New York, New York. In case of any inconsistencies between any of the terms and conditions of the Agreement, including any handwritten modifications thereto, and the terms and conditions of this Rider, the terms and conditions of this Rider shall prevail. All of the paragraphs and provisions contained in this Rider are incorporated into the Agreement and made a part thereof with the same force and effect as if therein originally contained.

      2.    (a)    Upon and subject to the terms and conditions set forth in this Rider, Developer agrees to sell and grant for a term of years which shall expire when the Lower Parcel Lease expires on the Retail Unit and Rental Unit and Purchaser agrees to purchase a license to use a lockable wine storage refrigerator designated as Wine Storage Bin <u>TBD</u> (the "Wine Storage Bin") simultaneously with the closing of title to the Unit. The license to use the Wine Storage Bin (the "Wine Storage Bin License") shall be substantially in the form set forth in Part II of the Condominium Offering Plan. The Purchase Price for the Wine Storage Bin License is $<u>0.00</u> ("Wine Storage Bin Price") which is separate from and in addition to the Purchase Price for the Unit. The Wine Storage Bin Price shall be paid at the closing of title to the Unit by Purchaser delivering a good certified check of Purchaser or official bank check payable to Developer or such other party as Developer may designate upon not less than two (2) days notice. Purchaser shall be responsible for the payment of transfer and other taxes, if any, that are associated with the Wine Storage Bin License.

      (b)    A default by Purchaser under this Rider shall constitute a default under the Agreement for the Unit and that any other default by Purchaser under the Agreement for the Unit shall constitute a default under this Rider entitling Sponsor to those remedies as more fully described in the Agreement and the Plan.

for use and/or occupancy at the time of the closing of title to the Unit and that notwithstanding such event, Purchaser shall remain obligated to close title to the Unit and purchase the Storage Bin License. In such event the Storage Bin Price shall be paid to Escrow Agent and Storage Bin License shall be executed at Closing and the Storage Bin Price and Storage Bin License shall be held in escrow by the Escrow Agent. Upon notification from Developer that the Storage Bin is available for use, Escrow Agent shall release the Storage Bin Price to Developer with interest earned thereon, if any, and shall deliver Storage Bin License to Purchaser.

3.    The captions in this Rider and the Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Rider or the Agreement or the intent of any provision hereof.

IN WITNESS WHEREOF, the parties have executed this Rider as of the date written hereinbelow.

DATE: *November 12, 2007*
(To be inserted by Developer after
countersignature by Developer)

DEVELOPER:
WB IMICO LEXINGTON LESSEE LLC

By:    _____
Name: Raizy Haas
Title:  Authorized Signatory

PURCHASER:

_____
Aviral Rai

_____
Sangeeta Rai

Consented to by Sponsor:
WB IMICO LEXINGTON FEE LLC

By:    _____
Name: Raizy Haas
Title:  Authorized Signatory

Exhibit B

# WILENTZ
# GOLDMAN
# &SPITZER P.A.

**ATTORNEYS AT LAW**

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
(732) 636-8000
Fax (732) 855-6117

Meridian Center I
Two Industrial Way West
Eatontown, NJ 07724-2265
(732) 542-4500
Fax (732) 493-8387

110 William Street
26th Floor
New York, NY 10038-3901
(212) 267-3091
Fax (212) 267-3828

Two Penn Center Plaza
Suite 910
Philadelphia, PA 19102
(215) 940-4000
Fax (215) 636-3999

Park Building
355 Fifth Avenue
Suite 400
Pittsburgh, PA  15222
(412) 232-0808
Fax (412) 232-0773

*website: www.wilentz.com*

Please reply to
Woodbridge
**Direct Dial: (732) 855-6171**
**Direct Fax: (732) 726-6602**
**Email: awasserman@wilentz.com**

November 9, 2009

**<u>Via UPS Overnight</u>**

WB IMICO Lexington Fee LLC
c/o Extell Development Company
805 Third Avenue, 7th Floor
New York, NY  10022


805 Third Avenue, 7th Floor

        **Re:    Aviral and Sangeeta Rai, The Lucida, Unit No. 8C**

Dear Sir or Madam:

        Please be advised that this firm represents Aviral and Sangeeta Rai (the "Rais"), contract purchasers of Unit No. 8C at The Lucida.

        On November 12, 2007, WB IMICO Lexington Fee LLC ("Sponsor") and the Rais executed an agreement for the purchase of Unit No. 8C at The Lucida for a purchase price of $4,287,466.00 (the "Purchase Agreement").  Pursuant to the Purchase Agreement and Rider thereto, the Rais had paid deposits totaling $643,119.30 toward the purchase price of the unit.

        The Purchase Agreement states in pertinent part:

        **IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES**

WB IMICO Lexington Fee, LLC
November 9, 2009
Page 2

**REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.**

The Rais never received a property report and therefore, are hereby giving you notice of their right to revoke the Purchase Agreement pursuant to the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, *et seq.* (the "Act"). Indeed, 15 U.S.C. § 1703(c) states:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

As a result of the Rais's revocation of the Purchase Agreement, they are entitled to all monies paid by them under the Purchase Agreement. See 15 U.S.C. § 1703(e).

Accordingly, based upon the Rais's exercise of their statutory revocation right, we request that you refund the sums paid to you by the Rais, totaling $643,119.30, plus all accrued interest thereon as required by law. These funds should be delivered by you to my office, payable to The Attorney Trust Account of Wilentz, Goldman & Spitzer, P.A., attorneys for the Rais, no later than November 16, 2009.

If such monies are not paid within this time period, more formal action will need to be taken. Please be advised that 15 U.S.C. § 1709(c) provides for the reimbursement of interest, court costs and attorneys fees.

WB IMICO Lexington Fee, LLC
November 9, 2009
Page 3

Please be guided accordingly.

Very truly yours,

ALAN WASSERMAN

LW:wp

cc:     Ahuva Genack, Esq. (via UPS Overnight Service)
        Aviral Rai (email)