UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVIRAL RAI and SANGEETA RAI, | **MEMORANDUM OPINION & ORDER** |
| Plaintiffs, | |
| - against - | |
| WB IMICO LEXINGTON FEE, LLC, | 09 Civ. 9586 (PGG) |
| Defendant. | |
| HASKELL LIMITED INC., | |
| Plaintiff, | 09 Civ. 9609 (PGG) |
| - against - | |
| WB IMICO LEXINGTON FEE, LLC, | |
| Defendant. | |
| JESSICA BENHAMOU, | |
| Plaintiff, | |
| - against - | 09 Civ. 9610 (PGG) |
| WB IMICO LEXINGTON FEE, LLC, | |
| Defendant. | |
| GARRETT BAUER, | |
| Plaintiff, | |
| - against - | 09 Civ. 9611 (PGG) |
| WB IMICO LEXINGTON FEE, LLC, | |
| Defendant. | |

MARILYN EZZES,

                    Plaintiff,

           - against -                09 Civ. 9612 (PGG)

WB IMICO LEXINGTON FEE, LLC,

                    Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

            Plaintiffs are purchasers of condominium units in "The Lucida," a condominium development in Manhattan, and have sued to rescind their purchase agreements and recover their deposits based on alleged violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720 (2009) ("ILSA" or the "Act").  (Rai Am. Cmplt. ¶ 1; Haskell Cmplt. ¶¶ 2-4; Benhamou Cmplt. ¶¶ 2-4; Bauer Cmplt. ¶¶ 2-4; Ezzes Cmplt. ¶¶ 2-4)  Defendant WB Imico Lexington Fee, LLC ("WB Imico") has counterclaimed for breach of contract, asserting that Plaintiffs breached their purchase agreements by refusing to pay the purchase price or close title on the units.  WB Imico seeks a declaration that it may retain Plaintiffs' deposits.  (Rai Am. Ans., Counterclaim ¶¶ 1-5; Haskell Am. Ans., Counterclaim ¶¶ 1-5; Benhamou Am. Ans., Counterclaim ¶¶ 1-5; Bauer Am. Ans., Counterclaim ¶¶ 1-5; Ezzes Am. Ans., Counterclaim ¶¶ 1-5)  Plaintiffs and Defendant also seek an award of attorneys' fees and costs.  (Rai Am. Cmplt. ¶ 80; Haskell Cmplt., Ad Damnum Clause; Benhamou Cmplt., Ad Damnum Clause; Bauer Cmplt., Ad Damnum Clause; Ezzes Cmplt., Ad Damnum Clause; Rai Am. Ans., Ad Damnum Clause; Haskell Am. Ans., Ad Damnum Clause; Benhamou Am. Ans., Ad Damnum Clause; Bauer Am. Ans., Ad Damnum Clause; Ezzes Am. Ans., Ad Damnum Clause)

All parties have cross-moved for summary judgment.  (Rai Dkt. Nos. 38, 46;

Haskell Dkt. Nos. 44, 56; Benhamou Dkt. Nos. 43, 55; Bauer Dkt. Nos. 42, 54; Ezzes Dkt. Nos.

45, 57)  The parties' motions turn on the question of whether WB Imico's failure to include tax

lot numbers in the purchase agreements executed by Plaintiffs constitutes a violation of ILSA

that permits Plaintiffs to rescind the agreements and recover their deposits.

For the reasons stated below, this Court concludes that ILSA applies to

condominium units, that the Act's "100-lot exemption" is not applicable, and that WB Imico's

failure to include tax lot numbers in the purchase agreements constitutes a violation of ILSA that

permits Plaintiffs to rescind the purchase agreements and recover their deposits.  Accordingly,

Plaintiffs' motions for summary judgment will be granted and Defendant's motions for summary

judgment will be denied.

## BACKGROUND

WB Imico is the sponsor and developer of The Lucida, a new condominium

development located at 151 East 85th Street, New York, New York.  (Pltfs. R. 56.1 Stmt. ¶ 2)[1]

On March 21, 2007, WB Imico filed an offering plan (the "Offering Plan") with the New York

State Department of Law representing that the The Lucida would consist of 110 residential units,

one retail unit, and one rental unit consisting of 24 apartments.  (Id. ¶ 4; Moss Decl., Ex. 21)

---

[1]  Unless otherwise noted, citations to the parties' Local Rule 56.1 statements concern factual
assertions that were admitted or are deemed admitted because the opposing party did not
contradict them with citations to admissible evidence.  See Giannullo v. City of New York, 322
F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in
the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).
"Pltfs. R. 56.1 Stmt." refers to Plaintiffs' Revised Amended Joint Rule 56.1 Statement dated
May 2, 2011.  "Rai R. 56.1 Stmt." refers to the Rai Plaintiffs' supplemental Rule 56.1 Statement
dated May 2, 2011.

By April 20, 2007 – approximately one month after the Offering Plan was filed
with the New York State Department of Law – buyers had executed purchase agreements for 17
units (Moss Decl., Ex. 22), representing 15% of the residential units in The Lucida.  It is
undisputed that WB Imico could have obtained tax lot numbers for the residential units at The
Lucida at that time, but chose not to do so.  (See 13 N.Y.C.R.R. § 20.3(q)(3); New York City
Department of Finance, Condominium Apportionment and Approval Process, NYC.GOV,
http://www.nyc.gov/html/dof/html/pdf/property/pro_506.pdf (last visited March 17, 2012);
Evanusa Decl. ¶¶ 6-7; Evanusa Supp. Decl. ¶¶ 9-11, 13)  Obtaining tax lot numbers at that time
would have required WB Imico to declare the condominium offering plan "effective."  WB
Imico chose not to declare the condominium offering plan "effective" until November 26, 2007,
by which time purchase agreements had been executed for 78 units at The Lucida – 71% of the
residential units offered for sale.[2]  (Moss Decl., Ex. 22)  Defendant did not go on to request

---

[2]  The New York City Department of Finance does not permit a declaration creating a
condominium to be recorded until an effectiveness amendment declaring the offering plan
effective has been "accepted for filing" by the New York State Department of Law.  (Evanusa
Decl. ¶ 6; New York City Department of Finance, Condominium Apportionment and Approval
Process, NYC.gov, http://www.nyc.gov/html/dof/html/pdf/property/pro_506.pdf (last visited
March 17, 2012))  In order for the New York State Department of Law to accept an effectiveness
amendment for filing, a condominium sponsor must have entered into agreements for the sale of
at least 15% of the units being offered for sale.  13 N.Y.C.R.R. § 20.3(q)(3) (providing that the
offering plan must "[s]tate that the plan may not be declared effective unless bona fide
purchasers, including investors, have signed purchase agreements for at least 15 percent of the
units offered under the plan."); VINCENT DI LORENZO, NEW YORK CONDOMINIUM AND
COOPERATIVE LAW § 4:7 (2d ed. 2007) ("For newly constructed, vacant or non-residential
condominiums . . . the plan may not be declared effective until executed purchase agreements
have been accepted by sponsor for not less than 15% of the units offered under the plan.").

WB Imico asserts that "the timing of the filing of the [effectiveness] Declaration [here] was
consistent with standard industry practice with respect to newly-constructed condominium
buildings in New York City. . . . In the period relevant to The Lucida (i.e., 2007 to 2009),
developers generally did not request, and the City did not assign, tax lot numbers for individual

assignment of tax lot numbers until April 7, 2009 (id., Ex. 24) and tax lot numbers were not

assigned to The Lucida's residential units until June 2, 2009.  (Id.; Evanusa Decl. ¶ 10; Evanusa

Supp. Decl. ¶ 9)

Between June 25, 2007 and February 27, 2008, each Plaintiff executed

substantially similar purchase agreements for condominium units in The Lucida, and each paid

WB Imico deposits pursuant to those agreements.[3]  In connection with the sale of units, WB

Imico prepared a property report ("Property Report") for each Plaintiff's respective unit and

delivered the report to each Plaintiff.[4]  (Pltfs. R. 56.1 Stmt. ¶ 6; Gazzola Decl. ¶ 5; Benhamou

Decl. ¶ 5; Bauer Decl. ¶ 5; Ezzes Decl. ¶ 5)  The purchase agreements executed by Plaintiffs did

not provide tax lot information for the individual units.  (Moss Decl., Exs. 4, 9, 14, 19; Rai Am.

Cmplt., Ex. A)  As noted above, tax lot numbers for the individual units in The Lucida were not

condominium units until the building at issue was fully constructed and a conforming
condominium declaration was ready to be recorded. . . . Under the relevant New York City
procedures, obtaining tax lot numbers before the building is substantially completed would be
wasteful in that it would have to be corrected based upon the final 'as-built' drawings, which
would involve duplication of effort and require a sponsor to incur substantial additional costs
(legal, architectural, title)." (Evanusa Supp. Decl. ¶¶ 10-11, 13)

[3]  On November 12, 2007, the Rai Plaintiffs signed an agreement to purchase unit 8C for
$4,287,466.  (Rai R. 56.1 Stmt. ¶ 16; Rai Am. Cmplt., Ex. A)  Pursuant to the agreement, the Rai
Plaintiffs paid WB Imico a 15 percent deposit of $643,119.90.  (Id.)  On June 25, 2007, Haskell
signed an agreement to purchase unit 11D for $3,721,746.  (Pltfs. R. 56.1 Stmt. ¶ 7(i); Moss
Decl., Ex. 4)  Haskell paid a deposit of $558,261.90.  (Id. ¶ 8(i); Moss Decl., Ex. 4)  On
November 20, 2007, Benhamou signed an agreement to purchase unit 12F for $2,798,298.  (Id. ¶
7(iv); Moss Decl., Ex. 9)  Pursuant to the agreement, Benhamou paid a deposit of $419,744.70.
(Id. ¶ 8(ii); Moss Decl., Ex. 9)  On February 27, 2008, Bauer signed an agreement to purchase
unit 12E for $4,721,439.  (Id. ¶ 7(iii); Moss Decl., Ex. 14)  Bauer paid a deposit of $708,215.85.
(Id. ¶ 8(iii); Moss Decl., Ex. 14)  On November 16, 2007, Ezzes signed an agreement to purchase
unit 11F for $2,753,070.  (Id. ¶ 7(ii); Moss Decl., Ex. 19)  Pursuant to the agreement, Ezzes paid
a deposit of $412,960.50.  (Id. ¶ 8(iv); Moss Decl., Ex. 19)

[4]  The Rai Plaintiffs assert that their Property Report was provided only to their lawyer and not to
them, allegedly in violation of ILSA.  (4/30/10 A. Rai Decl. ¶ 2; 4/30/10 S. Rai Decl. ¶ 2; Rai
Am. Cmplt. ¶¶ 24, 52)

assigned until on or about June 2, 2009, when the First Amended Condominium Declaration was

recorded.  (Moss Decl., Ex. 24; Evanusa Decl. ¶ 10; Evanusa Supp. Decl. ¶ 9)

        The Property Report issued to each Plaintiff advised that the purchase agreement

was not yet recordable, and that tax lot information for the individual unit was not yet available.

The disclosure section of the Property Report contains the following language under the heading

"Method and Purpose of Recording":

> Under New York law, the recording of the Agreement could protect you from other contract vendees and certain future creditors of the Developer.  However, under the terms of the Agreement, neither the Agreement nor any short-form summary thereof can be recorded in the Office of the New York City Register, County of New York and any recording of the Agreement by you in violation of the provisions of the Agreement is a breach of the Agreement.
>
> Subsequent to the closing, however, you can record the Tower Unit Deed conveying title to you, and this will protect you against claims of our subsequent creditors and buyers.
>
> **UNLESS YOUR DEED IS RECORDED YOU MAY LOSE YOUR UNIT THROUGH THE CLAIMS OF SUBSEQUENT PURCHASERS OR SUBSEQUENT CREDITORS OF ANYONE HAVING AN INTEREST IN THE LAND.**

(Haas Decl., Ex. C, at 9) (emphasis in original).

        The Property Report further provides:

> **NEITHER THE FLOOR PLANS NOR THE DECLARATION HAVE BEEN SUBMITTED TO THE RPAB [Real Property Assessment Bureau of the City of New York].  UNTIL THE FLOOR PLANS ARE FILED AND THE DECLARATION IS RECORDED, THE DESCRIPTION OF THE UNITS IS NOT LEGALLY ADEQUATE FOR THE CONVEYANCE OF THE TOWER UNITS.  THEREAFTER, EACH TOWER UNIT WILL BE LEGALLY DESCRIBED BY REFERENCE TO ITS UNIT AND TAX LOT NUMBER AS SET FORTH IN THE RECORDED DECLARATION AND FILED FLOOR PLANS.**

(Id., Ex. C, at 13) (emphasis in original)

At the time each Plaintiff signed his, her, or its purchase agreement, the Offering Plan for The Lucida and each Plaintiff's Property Report represented that The Lucida would contain 110 condominium units.  (Pltfs. R. 56.1 Stmt. ¶ 4(iii); Moss Decl., Ex. 21; Haas Decl., Ex. C)  Between April 12, 2007 and February 19, 2008, however, non-party purchasers of units in The Lucida reached agreements with WB Imico to combine units, thereby reducing the number of units to be sold in The Lucida to 98.  (Pltfs. R. 56.1 Stmt. ¶¶ 4(iv)–(xiv))  On August 6, 2007, the Department of Buildings approved revised floor plans that combined 23 units into 11 units (Id. ¶ 4(xvi)), and on October 27, 2008, the Fourteenth Amendment to the Offering Plan (the "Fourteenth Amendment") was filed with – and approved by – the New York State Department of Law amending the Offering Plan.  (Id. ¶ 4(xvii); Moss Decl., Ex. 23)  The Fourteenth Amendment represented that The Lucida would contain 98 condominium units, reflecting the various combinations of units referenced above.  (Moss Decl., Ex. 23)  The Sixteenth Amendment dated June 29, 2009, likewise represented that The Lucida would contain 98 condominium units.  (Haas Decl., Ex. B)

Between June 23, 2009 and November 9, 2009 – within two years of executing their respective purchase agreements – each Plaintiff sent a notice to WB Imico purporting to revoke their purchase agreement, pursuant to Section 1703(d) of ILSA, due to WB Imico's alleged failure to comply with ILSA's disclosure requirements.  (Rai R. 56.1 Stmt. ¶ 18; Pltfs. R. 56.1 Stmt. ¶ 9)  Plaintiffs likewise demanded the immediate return of their respective deposits.  (Rai R. 56.1 Stmt. ¶ 18; Pltfs. R. 56.1 Stmt. ¶ 19)  WB Imico has not returned to Plaintiffs any portion of the deposits.  (Pltfs. R. 56.1 Stmt. ¶ 10)

On or about December 28, 2009, each Plaintiff received a notice from WB Imico setting a closing date of February 1, 2010.[5]  (Def. R. 56.1 Stmt. ¶ 1; Haas Decl. ¶ 7)  WB Imico asserts that none of the Plaintiffs closed on the designated closing date, and that the time for Plaintiffs to exercise their rights to close under their respective purchase agreements has expired.[6]  (Def. R. 56.1 Stmt. ¶¶ 2-3; Haas Decl. ¶ 7)

In their joint motion for summary judgment, Plaintiffs argue, inter alia, that ILSA applies to a condominium development such as the The Lucida, that no exemption to ILSA is applicable, and that the purchase agreements violate Section 1703(d)(1) of the Act because they do not include a tax lot number for each purchased unit.[7]  (Pltfs. Moving Br. 11-12, 14-16, 19-

---

[5]  Plaintiffs dispute that all Plaintiffs received such a notice (Pltfs. R. 56.1 Resp. ¶ 1), but they do not cite to admissible evidence in support of their claim.

[6]  Plaintiffs dispute that they declined to close on the designated closing date and that their time to exercise their rights to close have expired, asserting that they had previously rescinded their purchase agreements under ILSA.  (Pltfs. R. 56.1 Resp. ¶¶ 2-3; Rai R. 56.1. Resp. ¶¶ 4-5)

[7]  All Plaintiffs also contend that the purchase agreements violate Section 1703(d)(3) of the Act because they do not clearly communicate that – in  the event the purchaser defaults or otherwise breaches the purchase agreement – the seller "'shall refund to such purchaser . . . any amount which remains after subtracting (A) 15 per centum of the purchase price of the [unit] . . . or the amount of damages incurred by the seller . . . as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser. . . ."  (Haskell Cmplt. ¶¶ 33-36 (quoting 15 U.S.C. § 1703(d)(3)); Benhamou Cmplt. ¶¶ 33-36; Bauer Cmplt. ¶¶ 33-36; Ezzes Cmplt. ¶¶ 33-36; Rai Am. Cmplt. ¶¶ 38-41).  While the purchase agreements appear to contain much of the substance of the required notice set forth in Section 1703(d)(3), Defendant included the following conditional language concerning application of the damage limitation:  "if and only to the extent that the sale of the Unit is not exempt from the provisions of [ILSA]. . . ."  (Moss Decl., Exs. 4, 9, 14, 19; Rai R. 56.1 Stmt., App'x, Ex. A)  Plaintiffs contend that the conditional language employed by Defendant – and provisions regarding the recovery of attorneys' fees – vitiate the notice and violate ILSA.  (Pltfs. Moving Br. 17-19)

The Rai Plaintiffs contend, in addition, that Defendant violated Section 1703(a)(1)(B) of ILSA by sending the Property Report concerning their unit only to their counsel and not to them.  (Rai Am. Cmplt. ¶¶ 22-24, 50-57; Rai Moving Br. 3-13; Rai Opp. Br. 3-13; Rai Supp. R. 56.1 Stmt. ¶ 1-4)

24)  In its summary judgment motion, WB Imico argues, <u>inter alia</u>, that (1) ILSA does not apply to units in urban high-rise condominiums such as The Lucida; (2) ILSA's "100-lot exemption" renders the Act inapplicable to all Plaintiffs but Haskell; and (3) in any event, the purchase agreements fully comply with ILSA.  (Def. Moving Br. 3)

<b><u>DISCUSSION</u></b>

## I.    <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." <u>Beyer v. Cnty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (citing <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  <u>Watson v. Consol. Edison Co. of N.Y., Inc.</u>, 374 F. App'x 159, 161 (2d Cir. 2010) (quoting <u>Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

---

The Court does not reach these arguments because it concludes, as explained below, that Defendant's failure to include the tax lot numbers in the purchase agreements constitutes a violation of ILSA that authorizes Plaintiffs to rescind the purchase agreements and obtain the return of their deposits.

summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment. . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

Here, the parties' cross-motions for summary judgment turn entirely on the interpretation of certain provisions of ILSA; the parties agree that there are no material issues of fact in dispute.  (Pltfs. Moving Br. 1, 10; Def. R. 56.1 Resp. 2)

## II.   ILSA APPLIES TO CONDOMINIUM DEVELOPMENTS

WB Imico argues that ILSA does not apply to urban high-rise condominiums such as The Lucida because units in such condominiums are not "lots" within the meaning of ILSA. WB Imico further contends that it would be "absurd" to apply the disclosure requirements of ILSA to a consumer buying an urban high-rise apartment.  (Def. Moving Br. 12)

ILSA was enacted as part of the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title XIV, 82 Stat. 590 (1968), and was extensively amended in 1979.  See Pub. L. No. 96-153, Title IV, 93 Stat. 1122 (1979).  The Act was "designed to prevent false and

9

deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1978). "The purpose of the Act was 'to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development, but actually under water or useful only for grazing.'" Indomenico v. 123 Washington, LLC, No. 10 Civ. 7886(RPP), 2011 WL 3739041, at *1 (S.D.N.Y. Aug. 24, 2011) (quoting Beauford v. Helmsley, 740 F. Supp. 201, 209 (S.D.N.Y. 1990)). Unless a statutory exemption applies, any contract for the sale of a lot that does not make the required disclosures "may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement." 15 U.S.C. § 1703(d). Furthermore, "the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable." 15 U.S.C. § 1709(a).

"Although Congress was concerned primarily with dishonest sales tactics relating to raw, undeveloped land, the statute refers generally to 'the sale or lease of any lot,' which [the U.S. Department of Housing and Urban Development ("HUD")] has interpreted to include condominium units." Pasquino v. Lev Parkview Developers, LLC, No. 09 Civ. 4255(LMM), 2011 WL 4502205, at *6 (S.D.N.Y. Sept. 29, 2011) (quoting 15 U.S.C. § 1703(a)(1)) (citing 61 Fed. Reg. 13,596 (Mar. 27, 1996)).

Courts within and outside this District have uniformly applied ILSA to the sale of condominiums. See, e.g., Nickell v. Beau View of Biloxi, LLC, 636 F.3d 752, 754 (5th Cir. 2011) ("Regulations were adopted that included condominium units within the definition of 'lots' under ILSA, a definition we conclude is consistent with the statute."); Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1448 (11th Cir. 1985) ("We find that HUD's

10

inclusion of condominiums within [ILSA] is a reasonable interpretation of Congress' original intent in enacting the statute and the only defensible interpretation given subsequent events."); Indomenico, 2011 WL 3739041, at *7 ("The Court is satisfied that the legislative history and HUD's interpretative analysis amply dictate that [ILSA] applies to condominiums."); Nu-Chan, LLC v. 20 Pine St. LLC, No. 09 Civ. 00477(PAC), 2010 WL 3825734, at *3 (S.D.N.Y. Sept. 30, 2010) ("Several decisions of [the] Southern District of New York, many of them recent, have accepted HUD's analysis, and applied [ILSA] to condominium units.  Additionally, Congress's (1) failure to revise [ILSA] as a result of HUD's interpretation of the statute and (2) 1978 addition of 'condominium' to the 'improved lot' exemption . . . strongly suggest that Congress has acquiesced to HUD's interpretation.  The Court sees no need to disturb this trend and holds that condominium units are covered by the provisions of [ILSA]."); An v. Leviev Fulton Club, LLC, Nos. 09 cv 1937(GBD), 09 cv 3537(GBD), 09 cv 4706(GBD), 2010 WL 3291402, at *1 (S.D.N.Y. Aug. 10, 2010) ("condominium sales are within the scope of [ILSA]. . . ."); Cruz v. Leviev Fulton Club, LLC, 711 F. Supp. 2d 329, 331 (S.D.N.Y. 2010) ("While the ILSA's text refers to the sale of 'lots,' its protections apply to the sale of condominiums as well.").

WB Imico cites no contrary law, but urges this Court to reject Winter and its progeny, arguing that "the disclosures required by ILSA are so far removed from the concerns of a consumer buying an urban, high-rise apartment that it would be absurd to apply them in that context," and that "[u]nits in a high-rise urban condominium subject to the extensive regulatory scheme of New York's Martin Act are not 'lots' within the meaning of ILSA."  (Def. Moving Br. 12)  These arguments have been rejected by other courts.

In Smith v. Myrtle Owner, LLC, Nos. 09-CV-1655(KAM)(VVP), 09-CV-3809(KAM)(VVP), 09-CV-5484(KAM)(VVP), 10-CV-0326(KAM)(VVP), 10-CV-

11

0395(KAM)(VVP), 10-CV-0534(KAM)(VVP), 2011 WL 2635717 (E.D.N.Y. Feb. 9, 2011),

report and recommendation adopted by Sanz v. Myrtle Owner, LLC, 2011 WL 2635647

(E.D.N.Y. July 5, 2011), Magistrate Judge Pohorelsky performed a thorough analysis of the term

"lot" as used in ILSA, examining the text and structure of the Act, its legislative history and

purpose, and HUD's interpretation of the Act.  Id. at *3-8.  As here, the defendants in Smith

argued that the Act should not be read to apply to condominiums, because certain ILSA

provisions – including various exemptions and required disclosures relating to oil, gas, and

mineral rights and "general topography" – have no application to condominiums.  Id. at *3-4.

As the Smith court found, however, it is indisputable that many exemptions "in

the statute are potentially applicable to high-rise condominiums" and that "many required

disclosures . . . concerning the nature of the real estate, type of ownership, completion dates,

utilities, etc. are applicable to and relevant to condominiums."  Id. at *3 n.3, 4 (emphasis in

original).  The fact that not every exemption or disclosure requirement applies to condominiums

does not mean that Congress intended ILSA not to apply to condominiums:

> [t]here is simply no basis for concluding that every exemption listed in the statute
> must be potentially available to every subdivision subject to the Act.  It does not
> require different definitions of the word "lot" to make certain exemptions
> available to some subdivisions, while recognizing that they will never be available
> to others.

Id. at *3.

Finally, as Judge Crotty noted in Nu-Chan, "Congress's (1) failure to revise

[ILSA] as a result of HUD's [consistent] interpretation of the statute [as applying to

condominiums] and (2) 1978 addition of 'condominium' to the 'improved lot' exemption . . .

strongly suggest that Congress has acquiesced to HUD's interpretation."  Nu-Chan, 2010 WL

3825734, at *3.

Consistent with the interpretation of the Act adopted by HUD and every court that has considered the issue, this Court concludes that ILSA applies to urban high-rise condominium units such as The Lucida units at issue here.

## II.     ILSA'S 100-LOT EXEMPTION DOES NOT APPLY

WB Imico argues that ILSA's "100-lot exemption" renders the Act inapplicable to the units purchased by Plaintiffs Rai, Benhamou, Bauer, and Ezzes.

Section § 1702(b)(1) of the Act provides, in pertinent part:

> [u]nless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions requiring registration and disclosure . . . shall not apply to the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under [§ 1702(a)].

In Bodansky v. Fifth On Park Condo, LLC, 635 F.3d 75 (2d Cir. 2011), the Second Circuit held that "under ILSA, a lot's eligibility for the 100-lot exemption is determined as of the time a purchaser or lessee signs a contract to purchase or lease that lot."  Id. at 87.

As noted above, it is undisputed that at the time Plaintiffs signed their respective purchase agreements, the Offering Plan represented that The Lucida would contain 110 residential units when completed.  (Moss Decl., Ex. 21, at cover page)  It was not until the Fourteenth Amendment to the Offering Plan, dated October 27, 2008 – after all Plaintiffs had executed their purchase agreements – that WB Imico declared for the first time that The Lucida would consist of 98 units.  (Id., Ex. 23, at 1)

WB Imico argues that "[b]y combining theoretical boxes of air, notionally denoted as 'apartments,' to fewer than 100 by documented agreement, the developer became entitled to the 100-Lot Exemption – and generated the records required to do so – especially as the HUD regulations confirm that a developer may rely on documented exemptions for 'either past or future sales.'"  (Def. Moving Br. 24 (citing 61 Fed. Reg. at 13,604))  WB Imico further

argues that ILSA has a self-regulatory structure and that a developer may take advantage of a statutory exemption provided that it maintains records demonstrating that the requirements of the exemption have been met. (Id. at 23-24 (citing 24 C.F.R. § 1710.4(d)))

Courts considering this question, however, have uniformly determined that "[f]or the purposes of the 100-lot exemption, the relevant number is the number of units communicated by the developer to the buyer and the purchasing public, regardless of whether the developer contemplated adjusting the ultimate number of units downward to less than 100." First Global Corp. v. Mansiana Ocean Residences, LLC, No. 09 21092-Civ., 2010 WL 2163756, at *4 (S.D. Fla. May 27, 2010) (emphasis added) (citing Grove Towers, Inc. v. Lopez, 467 So. 2d 358, 361 (Fla. Dist. Ct. App. 1985)). In First Global, the court determined that the 100-lot exemption was not applicable, because "at the time that [the purchaser] contracted to purchase its unit, the only information communicated to [the purchaser], and to the public at-large, was that the [condominium] would consist of 135 units." Id.

Similarly, in Nickell, the Fifth Circuit ruled that the language of the statute "provide[s] for an exemption where, at the time of sale, the sold lots are part of land 'divided or . . . proposed to be divided into' fewer than 100 lots not exempt under Section 1702(a) 'for the purpose of sale . . . as part of . . .' 'a plan undertaken by a . . . developer.'" Nickell, 636 F.3d at 756 (emphasis in original). The court noted that

> if at the time of sale of a lot in a subdivision, the subdivision as described to the purchaser is to contain 100 or more lots that are not yet exempt under Section 1702(a), the developer may not take advantage of the 100-lot exemption. On the other hand, if at the time of sale of a lot in the subdivision, the subdivision proposes to contain fewer than 100 lots that are not exempt under Section 1702(a), the 100-lot exemption may be utilized.

Id.; see also Griffith v. Steiner Williamsburg, LLC, 760 F. Supp. 2d 345, 358 (S.D.N.Y. 2010) ("In determining whether the 100 lot exemption applies here, this Court will consider how many

non-exempt lots the developer <u>publicly was offering to sell</u> at the time plaintiffs entered into

their Purchase Agreements.") (emphasis added);  <u>Grove Towers</u>, 467 So. 2d at 361 (developer

was not entitled to the 100-lot exemption because "[a]t the time [purchasers] signed the purchase

and sale agreement . . . they were given condominium documents (disclosure statement and

declaration of condominium, among others) which stated that [the] Condominium would consist

of a total of 108 units.").  In sum, a sponsor's argument that it "always planned to sell no more

than 90 units," or that – subsequent to issuance of an offering plan – it decided to reduce the

number of units for sale but had not communicated that to the public or prospective purchasers,

will not justify application of the 100-lot exemption.  <u>Nickell</u>, 636 F.3d at 755-56.

    This interpretation of the 100-lot exemption is consistent with the purpose of the

Act.  "The interlocking protections Congress provided in ILSA offer purchasers the ability to

make an informed decision at the time they sign a contract to purchase or lease a lot."  <u>Bodansky</u>,

635 F.3d at 83; <u>see</u> <u>also</u> <u>Griffith</u>, 760 F. Supp. 2d at 357 ("ILSA's registration and disclosure

provisions make clear that Congress was trying to protect the purchaser at the time of the sale by

providing the purchaser with the facts and rights necessary to make an informed decision before

incurring obligations under the purchase agreement.") (citations omitted).  "'The disclosure

requirements of [ILSA] are designed to prevent fraud in interstate land transactions, and the Act

should be liberally construed in favor of broad coverage to effectuate its remedial purpose.'

ILSA's exemptions, on the other hand, should be narrowly construed."  <u>Id.</u> at 356 (quoting <u>De</u>

<u>Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.</u>, 608 F.2d 1297, 1302 (9th Cir. 1979) and

citing <u>Long v. Merrifield Town Ctr. Ltd. P'ship</u>, 611 F.3d 240, 245 (4th Cir. 2010) ("Because

[ILSA] is a remedial statute, however, we construe its exemptions narrowly."); <u>Olson v. Lake</u>

<u>Country, Inc.</u>, 955 F.2d 203, 206 (4th Cir. 1991) (As a remedial statute, ILSA's exemptions "are

to be construed narrowly"); <u>Markowitz v. Ne. Land Co.</u>, 906 F.2d 100, 105 (3d Cir. 1990)

("[T]he general rule of statutory construction [is] that exemptions from remedial statutes such as

[ILSA] are to be narrowly construed."); <u>An</u>, 2010 WL 3291402, at *1 ("the protections of

[ILSA] and are to be construed broadly, while the exemptions are to be construed narrowly")).

Because at the time the Plaintiffs signed their respective purchase agreements the

Offering Plan for The Lucida indicated that the development would contain 110 residential units,

ILSA's 100-lot exemption does not apply to Plaintiffs' purchase agreements.

## III.    THE PURCHASE AGREEMENTS VIOLATE ILSA

### A.    Statutory Background

Section 1703(d)(1) of ILSA provides that

> [a]ny contract or agreement which is for the sale or lease of a lot not exempt
> under section 1702 of this title and which does not provide – (1) <u>a description of
> the lot which makes such lot clearly identifiable and which is in a form acceptable
> for recording</u> by the appropriate public official responsible for maintaining land
> records in the jurisdiction in which the lot is located . . . may be revoked at the
> option of the purchaser or lessee for two years from the date of the signing of such
> contract or agreement.

15 U.S.C. § 1703(d)(1) (emphasis added).  Plaintiffs argue that their purchase agreements violate

Section 1703(d)(1) because they "fail[ ] to identify the Unit[s] in a form acceptable for recording,

because [they] do[ ] not include the tax lot information for each Unit."  (Pltfs. Moving Br. 14)

Based on this alleged ILSA violation, Plaintiffs seek to exercise their right to revoke their

respective purchase agreements pursuant to Section 1709(b) of the Act, which provides that "[a]

purchaser or lessee may bring an action at law or in equity against the seller or lessor (or

successor thereof) to enforce any right under subsection . . . (d) . . . of section 1703 of this title."

15 U.S.C. § 1709(b).

The parties agree that under New York law the conveyance of a condominium unit cannot be recorded unless accompanied by a report that includes the tax lot information for the unit.  (Pltfs. Moving Br. 14; Def. Moving Br. 6; see N.Y. Real Property Law § 333(1-e)(ii)(3) ("A recording officer shall not record or accept for record any conveyance of real property affecting land in New York state unless accompanied by a transfer report form prescribed by the commissioner of taxation and finance . . .[which] shall contain . . . the appropriate tax map designation, if any")).  Because the purchase agreements here did not contain tax lot information, they were not "in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located."  15 U.S.C. § 1703(d)(1).

WB Imico concedes that the purchase agreements do not provide tax lot numbers for each unit.  (Def. Moving Br. 6)  There is likewise no dispute that Defendant could have obtained tax lot numbers for Plaintiffs' units before the purchase agreements were executed because – before the purchase agreements were executed – WB Imico had entered into agreements for the sale of at least 15% of The Lucida's residential units.  Finally, WB Imico does not contend that the purchase agreements were "in a form acceptable for recording by the appropriate public official responsible for maintaining land records in [New York City]."  15 U.S.C. § 1703(d)(1).

WB Imico nonetheless contends that it "fully complied with ILSA" because it complied with a HUD regulation, 24 C.F.R. § 1710.109, detailing "what a developer is to do where an interest in a sub-division is not recordable at the time of contract."  (Def. Moving Br. 6)  WB Imico also argues that

> [i]n both the Property Report and the Offering Plan, each of the residential units in The Lucida was identified by unit number, and the Offering Plan included a

17

> corresponding floor plan and deed approved by the New York State Department of Law and the [New York City Department of Finance].   Defendant also provided the tax lot information for The Lucida as a whole. . . . Plaintiffs plainly knew which units they were purchasing and where in the unbuilt condominium their units would be located, and each Agreement clearly identified the unit being sold.

(Id. (citing Evanusa Decl. ¶¶ 3-5))  Finally, WB Imico asserts that its actions were "consistent with industry practice" and that it would have been "wasteful" for it to have obtained tax lot numbers for Plaintiffs' units in April 2007 when – because of the sale of 15% of the units – it concededly could have obtained tax lot numbers for these units.  (Evanusa Supp. Decl. ¶¶ 10-11, 13)

        **B.**      **Analysis**

        **1.**        **The Language of 15 U.S.C. § 1703(d)(1) is Clear**

"Statutory analysis begins with the text and its plain meaning, if it has one." Gottlieb v. Carnival Corp., 436 F.3d 335, 337 (2d Cir. 2006) (citing Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2001)).  "'When a statute's language is clear, [a court's] only role is to enforce that language "according to its terms."'"  Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d 210, 216 (2d Cir. 2008) (quoting Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 236 (2d Cir. 2006) (quoting Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006))).  A court must "interpret a statute as it is, not as it might be, since 'courts must presume that a legislature says in a statute what it means and means in a statute what it says. . . .'"  Id. (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).

"If the intent of Congress is clear, that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  The

18

Supreme Court has made clear that "deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48 (1987)).  If a court "conclude[s], after employing standard tools of statutory interpretation, that Congress has 'unambiguously expressed' its meaning, that meaning controls." Riverkeeper, Inc. v. U.S. E.P.A., 358 F.3d 174, 184 (2d Cir. 2004) (citing Chevron U.S.A., Inc., 467 U.S. at 843).  "'[I]f,' on the other hand, 'the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute,' which is to say, one that is 'reasonable,' not 'arbitrary, capricious, or manifestly contrary to the statute.'" Id. (quoting Chevron, 467 U.S. at 843-44).

Here, Congress's intent is clear from the unambiguous language of Section 1703(d)(1):  where a purchase agreement does not provide a description of the lot "in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located," the agreement "may be revoked" by the purchaser for two years from the date of the signing of that agreement.  15 U.S.C. § 1703(d)(1) (emphasis added).  WB Imico does not contend that the description of the units contained in the purchase agreements was "in a form acceptable for recording."  Accordingly, the purchase agreements are subject to revocation.[8]  None of Defendant's arguments undermine this conclusion.

---

[8] Taplett v. TRG Oasis (Tower Two), Ltd., 755 F. Supp. 2d 1197 (M.D. Fla. 2009) and In re Paramount Lake Eola, L.P. Litig., Nos. 6:08-cv-1247-Orl-28KRS, et al., 2009 WL 2525558 (M.D. Fla. Aug. 17, 2009), cited by Defendant (see Def. Moving Br. 8-9) are not to the contrary.

        2.      **The HUD Regulation Cited by Defendant Can Not**
                <u>**and Does Not Alter the Meaning of Section 1703(d)(1)**</u>

        With respect to the HUD regulation cited by Defendant, no agency can issue a

regulation that contradicts or varies the clear terms of a statute.  <u>Chevron U.S.A., Inc.</u>, 467 U.S.

at 842-43 ("If the intent of Congress is clear, that is the end of the matter[,] for the court, as well

---

In <u>Taplett</u>, plaintiff had entered into a purchase agreement for a Florida condominium and argued
that the defendant developer had violated Section 1703(d)(1) because the purchase agreement
failed to provide a description of the lot in a form acceptable for recording.  755 F. Supp. 2d at
1204.  Under Florida law, condominiums are created by filing a declaration which contains
"numerous disclosures, including a legal description of the land, identifications of individual
units, and surveys of the land."  <u>Id.</u>  Once the declaration is filed, parties may then file a
"description of the condominium parcel by the number or other designation by which the unit is
identified in the declaration, together with the recording data identifying the declaration," which
constitutes "a sufficient legal description for all purposes."  <u>Id.</u>  Condominiums may be sold
prior to the filing of the declaration, however, so long as the developer prepares and files a
prospectus – also containing numerous disclosures – and provides the prospectus to each buyer
prior to execution of the purchase agreement.  <u>Id.</u>  In <u>Taplett</u>, the defendant did not immediately
file a declaration, but instead prepared a prospectus which contained a proposed declaration.  <u>Id.</u>
at 1205.  Defendant attached the proposed declaration to plaintiff's purchase agreement.  <u>Id.</u>  The
Court found that in light of defendant's "disclosure of the proposed Declaration (which included
a property description and other information) and <u>its compliance with Florida's statutory
framework</u>," there was "no violation of § 1703(d)(1)."  <u>Id.</u> (emphasis added).  The Court noted
that "[w]hile the contract [itself] did fail to reference the declaration's 'recording data',
[defendant] actually gave more:  the proposed declaration itself along with a contractual
obligation to file it prior to closing.  To penalize a developer for giving the entire document
rather than a mere identifying reference (required so that the same document could be found)
would be absurd."  <u>Id.</u>  Thus, contrary to WB Imico's argument, the <u>Taplett</u> court did not hold
that a recordable description of a condominium unit is not required.

<u>In re Paramount Lake Eola, L.P Litig.</u> – which does not involve an alleged violation of Section
1703(d)(1) or an allegedly defective purchase agreement – is clearly distinguishable.  In
<u>Paramount Lake</u>, plaintiffs argued that the property report provided to them did not contain all of
the information required by 24 C.F.R. § 1710.118.  2009 WL 2525558, at *14.  Specifically,
plaintiffs argued that the "Receipt, Agent Certification and Cancellation Page" required by the
regulation and provided to plaintiffs did not list "the Lot, Block and Section" describing the unit.
<u>Id.</u> at *16.  The court found that although the sample form for the "Receipt, Agent Certification
and Cancellation Page" in the regulation provides lines for "Lot," "Block," and "Section," the
format of the form did not impose a statutory obligation to disclose tax lot information on this
page of the property report.  The court found "no lack of compliance" and that filling in the unit
number was sufficient.  <u>Id.</u>  This holding does not suggest that a developer need not comply with
the disclosure requirements of Section 1703(d)(1).

as the agency, must give effect to the unambiguously expressed intent of Congress.").  Here, because Congress has "'unambiguously expressed' its meaning, that meaning controls," and there is no justification for considering an agency's interpretation of the statute.  Riverkeeper, Inc., 358 F.3d at 184 (citing Chevron U.S.A., Inc., 467 U.S. at 843).  Even if this Court were to consider the HUD regulation cited by Defendant, however, it does not argue for a different result.

HUD is charged with administrating ILSA, 15 U.S.C. § 1715, and it has authority to issue any "rules[,] regulations and . . . orders as are necessary or appropriate to the exercise" of HUD's administration and enforcement of the Act.  Id. § 1718.  Pursuant to this statutory authority, HUD has issued regulations to implement Section 1703(d)(1).  In arguing that it has complied with ILSA, WB Imico cites portions of 24 C.F.R. § 1710.109(d)(1) which address required disclosures in a property report:

> (iii)  If the developer or subdivision owner will not have the sales contract officially acknowledged or if the applicable jurisdiction will not record sales contracts, state that sales contracts will not be recorded and why they will not be recorded.
>
> (iv)  If at, or immediately after, the signing of a contract, the contract or a deed transfer to the buyer is not recorded by the developer or owner or if title to the lot is not otherwise transferred of record to a trust, or if other sufficient notice of transfer or sale is not placed of record, then the developer shall include the following, or substantially the same, warning in the disclosure narrative under the caption "Method and Purpose of Recording":
>
> "Unless your contract or deed is recorded you may lose your lot through the claims of subsequent purchasers or subsequent creditors of anyone having an interest in the land".

24 C.F.R. § 1710.109(d)(1)(iii), (iv).

Here, as noted above, the Property Reports provided to Plaintiffs (or, as to the Rais, to their lawyer), stated that the purchase agreements were not yet recordable, and that tax

21

lot information for each individual unit was not yet available.  The disclosure section of each

Property Report contained language under the heading "Method and Purpose of Recording" that

is substantially similar to the language required by the HUD regulation.  (Haas Decl., Ex. C at P-

000522)

WB Imico argues that "[t]he HUD regulation necessarily rejects the argument that

non-recordation at the time of agreement justifies rescission where the disclosures contemplated

by 24 C.F.R. § 1710.109 have been made.  That regulation applies here because . . . the Property

Report specifically provided that the Agreements were not recorded prior to closing."  (Def.

Moving Br. 7)

The HUD regulation sheds no light on the dispute here, because it addresses a

different subject.  The statute requires a developer to provide a "description of the lot which

makes such lot clearly identifiable and which is in a form acceptable for recording."  15 U.S.C. §

1703(d)(1).  The HUD regulation does not address the nature of the lot description that a

developer must provide, but instead requires developers to make certain disclosures where a

sales contract or deed will not be recorded, including why the document will not be recorded and

what risks that presents to the purchaser.  The HUD regulation does not purport to modify the

requirements of Section 1703(d)(1), nor could it.  See Gen. Dynamics, 540 U.S. at 600.

### 3.      There is No Good Faith Exception under Section 1703(d)(1)

The Second Circuit acknowledged in Bodansky that Congress, in enacting ILSA,

created a strict liability regime:

> Congress enacted a registration and disclosure scheme for certain interstate land
> sales . . . and provided that if a developer violated the disclosure requirement, then
> the purchaser could revoke the agreement within 2 years of contract signing.
> Pointedly, Congress gave purchasers an exclusive right to revoke and did not
> provide for affirmative defenses other than the revocation and limitations periods.
> To the extent [the developer] questions the wisdom of Congress's statutory

22

Case 1:09-cv-09586-PGG   Document 52   Filed 03/19/12   Page 24 of 24

scheme, we note that Congress enacted a strict-liability revocation provision to (1) ensure that registration and disclosure in fact occurs, (2) limit the costly oversight of federal agencies into an activity traditionally regulated by state and local governments, and (3) allow unsophisticated purchasers to enforce their rights.

Bodansky, 635 F.3d at 86 (emphasis added).

In electing to create a strict liability regime, Congress made irrelevant a developer's good faith. Accordingly, WB Imico's arguments that it acted "consistent with standard industry practices" (Evanusa Supp. Decl. ¶ 10), and that obtaining tax lot numbers in April 2007 would have been "wasteful " (id. ¶ 13), do not excuse its failure to comply with Section 1703(d)(1). In choosing not to obtain tax lot numbers for Plaintiffs' units in April 2007 after 15% of The Lucida's units had been sold, WB Imico left itself vulnerable to the Act's revocation provision.

## CONCLUSION

For the reasons stated above, Plaintiffs' motions for summary judgment are GRANTED, and Defendant's motions for summary judgment are DENIED. The Clerk of the Court is directed to terminate the motions. (09 Civ. 9586(PGG) Dkt. Nos. 38, 46; 09 Civ. 9609 (PGG) Dkt. Nos. 44, 56; 09 Civ. 9610(PGG) Dkt. Nos. 43, 55; 09 Civ. 9611(PGG) Dkt. Nos. 42, 54; 09 Civ. 9612(PGG) Dkt. Nos. 45, 57)[9]

Dated: New York, New York
      March 19, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

_____
[9] The Court requires additional briefing on Plaintiffs' application for attorneys' fees and costs and will issue a separate scheduling order concerning these issues.

23